Scott A. Edelman (SE 5247)
Kylie Davidson (KD 0502)
**MILBANK, TWEED, HADLEY & McCLOY LLP**
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Counsel for Plaintiff Marc S. Kirschner,*
*as Trustee for the Refco Litigation Trust*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

<table>
<tr><td>

MARC S. KIRSCHNER,
as Trustee of the Refco Litigation Trust,

       Plaintiff,

   - against -

THOMAS HACKL, CLARNET
PROPERTIES S.A., ACIES ASSET
MANAGEMENT S.A., and W.P.M. S.A.,

      Defendants.

</td><td>

07 CIV 9238

NO. 07-CIV._____



**COMPLAINT**

**JURY TRIAL DEMANDED**

</td></tr>
</table>

Plaintiff Marc S. Kirschner (the "Trustee" or "Plaintiff"), as the Court-approved

Trustee for the Refco Litigation Trust[1] (the "Trust"), by and through undersigned counsel, brings

this action against:  Thomas Hackl ("Hackl"); Clarnet Properties S.A. ("Clarnet"); and Acies

Asset Management S.A. ("Acies"), and W.P.M. S.A. ("WPM") (collectively, the "Defendants").

---

[1]    The Trust is the duly authorized representative to commence all claims and causes of action
formerly owned by the bankruptcy estates of Refco Inc. and certain of its subsidiaries
(collectively, the "Debtors") pursuant to the Modified Joint Chapter 11 Plan of Refco Inc. and
Certain of its Direct and Indirect Subsidiaries, as confirmed by the United States Bankruptcy
Court for the Southern District of New York on December 15, 2006 (the "Plan").

## I.    **INTRODUCTION**

1.    On October 17, 2005 (the "Petition Date"), Refco Inc. and a number of its wholly owned subsidiaries were propelled into bankruptcy and eventual liquidation as a result of a massive financial fraud perpetuated for more than eight years by Refco's[2] former Chairman and CEO, Phillip Bennett ("Bennett"), with the aid and assistance of various other former Refco executives and owners (together with Bennett and Hackl, the "Co-Conspirators"). Hackl, before, during, and after his employment with Refco, played an instrumental role in carrying out the fraudulent scheme.  Numerous third parties also aided and abetted the fraud.

2.    Before Refco's abrupt financial collapse, Refco was one of the nation's leading independent providers of execution and clearing services for exchange-traded derivatives and a major provider of prime brokerage services in the fixed income and foreign exchange markets.  Essential to the Co-Conspirators' scheme to enrich themselves by creating a false appearance of financial stability and success was their ability, through fraud, to create a manipulated perception among Refco's customers, creditors, and potential investors that Refco was very profitable, conservatively managed, and risk averse.

3.    Refco, however, was none of those things.  Under the management of Bennett, Hackl and the other Co-Conspirators, Refco was recklessly managed and suffered huge financial losses that had to be, and were, fraudulently concealed from Refco's customers, creditors, and potential investors.

---

[2]    As used herein, "Refco" is defined as, collectively, Refco Inc. and its direct and indirect subsidiaries.  The definition of Refco thus includes, at various times:  Refco Inc., which was formed in connection with an August 2005 public offering, and its direct and indirect subsidiaries; New Refco Group Ltd. LLC, which was formed in connection with an August 2004 leveraged buy-out, and its direct and indirect subsidiaries; and Refco Group Ltd., LLC ("RGL"), which was the parent corporate entity at all relevant times before August 2004, and its direct and indirect subsidiaries.

DC1:#8139906

4. While they were perpetrating a massive financial fraud, the Co-Conspirators stripped Refco of hundreds of millions of assets by way of fraudulent transfers from the Refco entities.

5. The fraudulent transfers orchestrated by the Co-Conspirators included several transfers to Defendant Clarnet, an entity wholly-owned by Hackl. The specific fraudulent transfers at issue in this complaint include (a) distributions disguised as "consulting fees" and/or "professional fees" made to Clarnet in each of the years 2000, 2001, 2002, 2003, and 2004; and (b) a distribution disguised as a loan made to Clarnet in 2004 (collectively, the "Clarnet Transfers").

6. This action is brought to avoid the Clarnet Transfers pursuant to sections 544 and 548 of title 11 of the United States Code, 11 U.S.C. §§ 101-1532 (as amended, the "Bankruptcy Code"), and section 270 et seq. of the New York Debtor and Creditor Law ("NY DCL"). Bennett and the other Co-Conspirators caused Refco to make the distributions at issue with the actual intent to hinder, delay, or defraud then present and future creditors of Refco. Further, one or more of the Clarnet Transfers were made for less than reasonably equivalent value and/or lack of fair consideration at a time when Refco was or became insolvent or had or was left with unreasonably small capital in relation to its business or its transactions.

7. This action seeks recovery of the Clarnet Transfers from Clarnet or Hackl pursuant to section 550(a)(1) of the Bankruptcy Code because Clarnet and Hackl were the initial transferees or the persons or entities for whose benefit the Clarnet Transfers were made. In the alternative, this action seeks recovery of the Clarnet Transfers from Hackl pursuant to section 550(a)(2) of the Bankruptcy Code on the grounds that Hackl was an immediate or mediate transferee, within the meaning of section 550(a)(2) of the Bankruptcy Code, and did not take the

Clarnet Transfers for value, in good faith, and without knowledge of the voidability of the Clarnet Transfers.

8.      This action also seeks to recover damages incurred as a result of Clarnet's breach of a $2 million Loan Agreement (as that term is defined below) that it executed with one of the Debtors in 2004.

9.      This action further seeks to recover damages incurred by the Debtors due to Hackl's breach of fiduciary duties, his aiding and abetting of the fraudulent scheme orchestrated by Bennett and the other Co-Conspirators, and his participation in a civil conspiracy to perpetuate the fraudulent scheme.

10.     Moreover, this action seeks to avoid the wrongful transfer of Refco Capital Markets Ltd.'s ("RCM") interest in Acies to Refco Group Holdings, Inc. ("RGHI") on or about June 30, 2004.  This action also seeks to avoid and recover from Hackl and/or Acies and/or WPM for the subsequent transfer of RCM's Acies interest from RGHI to, upon information and belief, Acies and/or WPM, either directly or *via* Hackl.

11.     Further, this action seeks to recover damages incurred by the Debtors due to Acies' breach of a contract entered into by Acies and RCM.

12.     This action seeks to recover the value of Clarnet Transfers described herein on the grounds that Clarnet and Hackl were unjustly enriched by the Clarnet Transfers because the Clarnet Transfers violated equity and good conscience.

13.     Finally, this action seeks equitable subordination of all claims of the Defendants.

## II.      JURISDICTION AND VENUE

14.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1332 and 1367. Some of the claims asserted arise under the laws of the United States and the remaining common

DC1:#8139906

law claims are so related to the federal question claims as to form a part of the same case or controversy. In addition, the plaintiff is a citizen of the State of New York and the Defendants are citizens of a state other than New York or are citizens of a foreign country. Clarnet, Acies, and WPM have principal places of business in a state other than New York and the amount in controversy exceeds $75,000 exclusive of interests and costs.

15.     Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b)(2), 1391(d), and 1409(a) and (c).

16.     On October 17, 2005, each of the Debtors filed a voluntary petition for relief under the Bankruptcy Code. *In re Refco, Inc.*, et al. Case No. 05-60006 (RDD). Refco's chapter 11 Plan was confirmed by the Bankruptcy Court for the Southern District of New York on December 15, 2006.

## III.     THE PARTIES AND RELEVANT NON-PARTIES

### A.     Plaintiff, Relevant Refco Entities, and Other Entities

17.     Plaintiff Marc S. Kirschner. Marc S. Kirschner is the Court-approved Trustee for the Refco Litigation Trust established pursuant to the Plan. Under the Plan, the Trustee is authorized to pursue the claims alleged herein.

18.     Refco Inc. Refco Inc. was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281. Refco Inc. was formed as part of the Refco Initial Public Offering in August 2005 (the "IPO"). As of August 2005, Refco Inc. was a publicly traded company that, through its subsidiaries, was in the business of providing securities brokerage, execution and clearing services for exchange-trade derivatives and providing prime brokerage services in the fixed income and foreign exchange markets. Refco Inc. filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

19.     <u>Refco Group Ltd. LLC</u>.  RGL is a subsidiary of Refco Inc. that was organized under the laws of Delaware, with its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RGL filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.  Other relevant subsidiaries of Refco Inc. include Refco Capital LLC and RCM, both of which also filed for bankruptcy protection under of the Bankruptcy Code on October 17, 2005.

20.     <u>Refco Group Holdings, Inc.</u>  RGHI is a non-Debtor, privately-held corporation that was organized under the laws of Delaware.  At all relevant times, RGHI was co- or wholly owned and controlled by Bennett.

21.     <u>Refco Capital Markets Ltd.</u>  RCM was a company organized under the laws of Bermuda.  At all relevant times, RCM had its principal place of business at One World Financial Center, 200 Liberty Street, Tower A, New York, New York, 10281.  RCM filed for bankruptcy protection under Chapter 11 of the Bankruptcy Code on October 17, 2005.

22.     <u>BAWAG.</u>  BAWAG P.S.K. Bank für Arbeit und Wirtshaft und Österreichische Postsparkasse Aktiengesellschaft ("<u>BAWAG</u>") is an Austrian bank with its headquarters at Österreichische Postsparkasse Aktiengesellschaft, Seitzergasse 2-4, A-1010 Vienna.

**B.     Defendants**

23.     <u>Defendant Thomas Hackl</u>.  From 1991 to 2002, Hackl served as the Head of Treasury and Investment Banking for BAWAG.  Hackl later served as Executive Vice President of RGL from June 2002 through 2004.  As Executive Vice President of RGL, Hackl was in charge of global asset management and served as a member of RGL's management committee.  During his employment with RGL, upon information and belief, Hackl remained

affiliated with BAWAG. After leaving RGL, Hackl became employed by Acies Asset Management S.A. in 2005, where he continued to be employed through 2006.

24.    <u>Defendant Clarnet Properties S.A.</u>  Upon information and belief, Clarnet is a Geneva, Switzerland-based investment company in which Hackl maintained a 100% ownership interest at all relevant times.

25.    <u>Defendant Acies Asset Management S.A.</u>  Upon information and belief, Acies is a Geneva, Switzerland-based provider of asset management services and derivative and foreign exchange execution and brokerage services.  Upon information and belief, Acies was, at all relevant times hereto, either controlled and/or owned (either in whole or in part) by Hackl. Moreover, upon information and belief, Acies was merged with Acies Advisors S.A. ("<u>AA</u>") and Acies is the successor entity.

26.    <u>Defendant W.P.M. S.A.</u>  Upon information and belief, WPM is a Luxemburg entity that acquired the shares of Acies, including the shares purportedly transferred by RCM to RGHI.

## IV.    **PROCEDURAL BACKGROUND**

27.    On October 10, 2005, Refco announced that it had discovered one aspect of what turned out to be a massive financial fraud that was engineered by Bennett and the Co-Conspirators.  Refco discovered (and disclosed) the existence of a previously undisclosed receivable (the "<u>RGHI Receivable</u>") owed to Refco by RGHI (then wholly owned by Bennett) in the amount of approximately $430 million.  Refco also announced that, as a result of the discovery of the previously undisclosed related-party transaction, "its financial statements, as of, and for the periods ended, Feb. 28, 2002, Feb. 28, 2003, Feb. 29, 2004, Feb. 28, 2005, and May 31, 2005, taken as a whole, for each of Refco Inc., Refco Group Ltd. LLC, and Refco Finance Inc. should no longer be relied upon."

DC1:#8139906

28.     The next day, Bennett was arrested.  Shortly thereafter, a grand jury sitting in this District indicted Bennett, charging him with securities violations, including conspiracy to commit securities fraud, wire fraud, making false filings with the Securities and Exchange Commission, making material misrepresentations to auditors, bank fraud, and money laundering.

29.     One week after Refco's disclosure, on October 17, 2005, the Debtors filed voluntary petitions for relief under the Bankruptcy Code.

## V.     RELEVANT FACTUAL BACKGROUND

### A.     The Fraudulent Scheme and Refco's Concealment Through the Round-Trip Loans

30.     Bennett and the Co-Conspirators orchestrated a massive financial fraud designed to artificially inflate Refco's financial position and allow them to fraudulently strip away Refco's assets.  The Co-Conspirators perpetrated this scheme by improperly moving hundreds of millions of dollars in trading losses and operating expenses off Refco's books, and transferring them to RGHI's books, creating the appearance that Refco had a collectible receivable from RGHI.  As of October 2005, the RGHI Receivable was approximately $430 million.

31.     Because a large receivable owed to Refco by RGHI, a related entity owned by its chief executive officer, would have invited scrutiny and skepticism, the Co-Conspirators needed a way to cover-up the magnitude and related-party nature of the RGHI Receivable at key reporting periods.

32.     For this purpose, the Co-Conspirators came up with a scheme that involved implementing a series of transactions at the end of each fiscal year (and beginning in 2004, also at the end of fiscal quarters) that were designed to reduce temporarily the RGHI Receivable and replace it on Refco's books with a receivable purportedly owed to Refco by

unrelated third parties (the "Round-Trip Loans"). The transactions were reversed just days after the end of the relevant reporting period and the RGHI Receivable was reinstated.

33. From 2000 to 2005, BAWAG served as one of the third parties to the Round-Trip Loans. With Hackl's knowledge and assistance, at the end of critical reporting periods, the Co-Conspirators would cause RCM or one of the other Debtors to extend substantial "loans" of between $175 and $225 million to BAWAG. On the same day, BAWAG would extend a "loan" to RGHI so that RGHI could temporarily pay down its obligation to Refco, *i.e.*, the RGHI Receivable.

34. For example, on or about February 25, 2003, one or more of the Debtors transferred $175 million to BAWAG. On the same day, from its account at Wachovia International NY, BAWAG made two transfers to RGHI: one transfer of $175 million and one of $75 million. RGHI used the $250 million to reduce its outstanding obligation to one or more of the Debtors for a period of approximately one week over the end of the Debtors' fiscal year, which was February 28, 2003.

35. In effecting these transactions, RGHI, Hackl, and Bennett all understood and agreed in advance that the transfers would be reversed on March 4, 2003. The parties also agreed that both of the $175 million transfers – from the Debtors to BAWAG, and from BAWAG to RGHI – would bear an identical rate of interest, thereby ensuring that that portion of the transaction had no economic consequences. For the $75 million transfer, RGHI agreed to "pay" BAWAG interest at a higher rate. This premium interest rate was to be BAWAG's compensation for participating in the fraudulent loan scheme.

36.     On March 4, 2003, all of the transfers were reversed as had previously been agreed among the parties to the transfers.  BAWAG repaid its "loan" to the Debtors at the same time that RGHI repaid its "loans" to BAWAG.

37.     Thus, the BAWAG loans enabled RGHI to substitute at the end of each fiscal year-end, for bookkeeping purposes only, an obligation owed by RGHI to one or more of the Debtors into an obligation owed by BAWAG to the Debtors.  A few days after the fiscal year-end, the transactions would be unwound and, for the remainder of the year, RGHI held the obligation to one or more of the Debtors.  Through this mechanism, Bennett, with the active assistance of Hackl, was able to alchemize a receivable from RGHI into a receivable from BAWAG.

38.     The transactions with BAWAG that took place in February-March 2003 are substantially similar to the Round-Trip Loans that occurred between the Debtors, BAWAG, and RGHI at the end of each fiscal year from 2000-2005.  The amounts of the loans are reflected in the chart set forth below:

| LOAN DATE | REPAYMENT DATE | DEBTORS' LOAN TO BAWAG ($M) | BAWAG LOAN(S) TO RGHI ($M) |
|---|---|---|---|
| 02/24/00 | 03/02/00 | $225 | $225 + $75 |
| 02/26/01 | 03/05/01 | $225 | $225 + $75 |
| 02/25/02 | 03/04/03 | $210 | $210 + $90 |
| 02/25/03 | 03/04/04 | $175 | $175 + $75 |
| 02/25/04 | 03/04/04 | $210 | $210 + $40 |
| 02/23/05 | 03/08/05 | $175 | $175 + $75 |

### B.   Hackl's Involvement in the Round-Trip Loans

39.     Upon information and belief, Hackl knew of and/or helped effectuate each of the BAWAG Round-Trip Loans from 2000-2005. Both while he served as the Head of Treasury and Investment Banking at BAWAG and after he became Executive Vice President at RGL, Hackl was instrumental in setting up the Round-Trip Loans, which the parties commonly referred to as "Clean Up."

40.     Communications between Hackl and individuals at BAWAG evidence that Hackl actively participated in "Clean Up" in 2003 while he was Executive Vice President of RGL. Upon information and belief, Hackl was also involved in the Round-Trip Loans in 2004 and 2005. Hackl participated in these Round-Trip Loans all while he was receiving compensation from RGL.

41.     Documents also make clear that Hackl was intimately involved in the Round-Trip Loans that occurred prior to his employment with RGL during 2000, 2001, and 2002 while he served as Head of Treasury and Investment Banking at BAWAG.

42.     Even after Hackl left RGL, he continued to help Bennett perpetuate the fraudulent scheme. In early October 2005, Bennett, with the aid and assistance of Hackl, sought to obtain a loan of approximately $420 million from BAWAG to pay down the RGHI receivable. BAWAG made the loan on October 10, 2005. The next day, Bennett was indicted for his participation in Refco's massive financial fraud.

43.     Upon information and belief, Hackl knew at all relevant times that Bennett and the other Co-Conspirators were using the Round-Trip Loans to hide the substantial RGHI Receivable and that the Round-Trip Loans served no proper commercial purpose and did no more than circulate money from the Debtors to BAWAG to RGHI for the sake of appearances at the end of accounting periods.

DC1:#8139906

C.    **Payments and Other Transfers to Hackl**

44.    While Hackl assisted Bennett and the other Co-Conspirators in carrying out the fraudulent Round-Trip Loans from 2000-2005, Hackl received hundreds of thousands of dollars from Refco.  In total, Hackl received more than $250,000 in direct transfers from Refco. Hackl is an insider of RGL and RCC within the meaning of section 101(31) of the Bankruptcy Code.  On information and belief, Hackl was party to an employment contract with RGL and/or RCC not entered into in the ordinary course of business of RGL and/or RCC.

D.    **The Fraudulent Transfers to Clarnet/Hackl**

45.    While Hackl helped Bennett and the other Co-Conspirators carry out the fraudulent Round-Trip Loans from 2000 to 2005, Hackl, through Clarnet, received millions of dollars from RCC and/or RGL in the form of the Clarnet Transfers.

46.    At the direction of Bennett and the other Co-Conspirators, RCC and/or RGL made the Clarnet Transfers with the actual intent to hinder, delay, or defraud Refco's then existing and future creditors.

47.    In the alternative, certain of the transfers were made without Clarnet and/or Hackl providing reasonably equivalent value or fair consideration and (i) were made at a time when RCC and/or RGL (a) were insolvent and/or became insolvent as a result of the transfers or (b) were left with unreasonably small capital in relation to their businesses or transactions; or (ii) were made to or for the benefit of Hackl (an insider), or incurred to or for the benefit of Hackl, under an employment contract and not in the ordinary course of business.

48.    The following is a list of the Clarnet Transfers that RCC and/or RGL made to Clarnet, which, upon information and belief, is and/or was wholly-owned by Hackl:

(a)    $2,000,000 on December 20, 2004;

(b)    $3,000,000 on September 28, 2004;

- 12 -

(c) $7,909,113.75 on March 19, 2004;

(d) $12,500 on December 31, 2003;

(e) $412,500 on September 30, 2003;

(f) $112,500 on June 30, 2003;

(g) $12,500 on May 19, 2003;

(h) $12,500 on December 31, 2002;

(i) $12,500 on September 30, 2002;

(j) $112,000 on July 1, 2002;

(k) $12,500 on April 1, 2002;

(l) $12,500 on December 31, 2001;

(m) $12,500 on October 1, 2001;

(n) $112,000 on July 2, 2001;

(o) $12,500 on April 2, 2001;

(p) $12,500 on January 2, 2001;

(q) $12,500 on October 2, 2000;

(r) $112,500 on July 14, 2000; and

(s) $12,500 on March 31, 2000.

49.     Clarnet provided no value to RCC and/or RGL in exchange for any of the Clarnet Transfers.  Upon information and belief, all of the Clarnet Transfers were nothing more than fraudulent payments made to Hackl for his own personal benefit.

50.     With the exception of the $2,000,000 transfer on December 20, 2004, upon information and belief, the Clarnet Transfers were made as "consulting fees" and/or

"professional fees." Upon information and belief, Clarnet did not perform any consulting, professional, or other services in exchange for these transfers.

51.     The $2,000,000 transfer made on December 20, 2004 represents the principal of a "loan" made by RGL to Clarnet, which, upon information and belief, was memorialized by a note setting forth the terms of the loan (the "Loan Agreement"). This loan was never repaid, and, upon information and belief, Clarnet never intended it to be repaid.

52.     At the time of the Clarnet Transfers that occurred on December 20, 2004 and September 28, 2004, RCC and/or RGL were or became insolvent or had, or were left with, unreasonably small capital in relation to its business or its transactions, or such transfers were made to or for the benefit of Hackl (an insider) or RCC and/or RGL incurred such obligations to or for the benefit of Hackl, under an employment contract and not in the ordinary course of business.

53.     At all relevant times when Clarnet received these wire transfers, Hackl was actively participating in the fraudulent Round-Trip Loans.

**E.   Acies' Wrongful Conduct**

(1)    Improper Transfer of RCM's Interest in Acies

54.     In 2004, RCM held at least a 35% interest in Acies. In connection with RCM's acquisition of its interest in Acies, from September 2000 through May 2004, RCM had contributed 200,000 Swiss francs ("SF") per month as an operating subsidy to Acies. In total, RCM contributed more than SF 8.4 million in operating subsidies to Acies. Upon information and belief, RCM received no benefit in return.

55.     Upon information and belief, at all relevant times hereto, Acies was controlled and/or owned in part by Hackl.

56.     Upon information and belief, on or about June 30, 2004, Santo Maggio ("Maggio"), a fellow participant in the Round-Trip Loan scheme, purported to cause RCM to transfer its interest in Acies to RGHI (the "Acies Interest Transfer"). RCM received no consideration in return.

57.     Maggio and other Co-Conspirators caused RCM to make the Acies Interest Transfer with the actual intent to hinder, delay, or defraud RCM's then existing and future creditors.

58.     Upon information and belief, sometime after RCM transferred its interest in Acies to RGHI, AA was merged into Acies (the "Acies Merger"). Moreover, on or about July 2004, WPM acquired all the outstanding shares of Acies.

59.     Upon information and belief, RGHI transferred its ownership stake in Acies to either Hackl and/or Acies, either directly or through Hackl.

60.     Upon information and belief, subsequent to the transfer to Hackl and/or Acies, all shares of Acies were acquired by WPM, making WPM the immediate or mediate transferee of RCM's interest in Acies.

61.     Upon information and belief, the purported Acies Interest Transfer was made so that Hackl could effectuate, with the assistance of RGHI, the sale of 100% of Acies to WPM. Thus, the Acies Interest Transfer was made in furtherance of the fraudulent schemes being perpetuated by Hackl and the other Co-Conspirators.

62.     Specifically, the Acies Interest Transfer was made as part of the fraudulent scheme to bleed the Debtors of their assets and transfer said assets to Bennett, RGHI, Hackl, and the other Co-Conspirators.

63.     As such, Acies, under the direction and control of Hackl, aided and abetted in the perpetuation of the fraudulent scheme and is liable for bleeding the Debtors of their assets by improperly transferring RCM's interest to RGHI for his own personal benefit.

64.     Plaintiff seeks to avoid the Acies Interest Transfer.  Plaintiff also seeks to avoid and recover the Acies Interest Transfer from Hackl, Acies, and/or WPM as the mediate or immediate transferees of the Acies Interest Transfer.  Upon information and belief, Hackl, Acies, and/or WPM did not take the transfer for value, in good faith, and without knowledge of its voidability.

65.     Plaintiff also seeks to recover from both Acies and WPM, upon information and belief, for aiding and abetting in the fraudulent scheme and Acies' and WPM's involvement in the civil conspiracy.

(2)     Acies' Breach of the Referral and Revenue Sharing Agreement

66.     On August 17, 2000, RCM entered into a brokerage, referral and revenue sharing agreement (the "Revenue Sharing Agreement") with Acies whereby RCM was to receive 50% of the first SF 5 million of Acies's net revenue (SF 2.5 million) and 20% of net revenues thereafter.

67.     As of May 2004, amounts due and owing to RCM from Acies under the profit sharing arrangement were approximately SF 7.8 million.

68.     Upon information and belief, to date, no amounts under the Revenue Sharing Agreement have been remitted to Refco by Acies.

69.     Accordingly, Plaintiff seeks specific performance of the Revenue Sharing Agreement by Acies or, in the alternative, to recover from Acies, for its breach of the Revenue Sharing Agreement and to recover any amounts due and owing under the Revenue Sharing Agreement.

**COUNT I**
**Recovery from Clarnet for December 20, 2004 Fraudulent Transfer**
**(11 U.S.C. §§ 544(b), 548(a)(1)(B), 550(a)(1), NY DCL §§ 270 et seq.)**

70.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this first cause of action.

71.     Each of the Loan Agreement and the $2,000,000 Clarnet Transfer made on December 20, 2004 (the "$2,000,000 Transfer") constituted a transfer of an interest in property of RGL.  At the time the transfers were made, RGL had at least one creditor with an unsecured claim for liabilities.

72.     The Loan Agreement and the $2,000,000 Transfer, which were made within one year of the Petition Date, were made at a time when RGL (a) was insolvent and/or became insolvent as a result of the transfer or (b) was left with unreasonably small capital in relation to its businesses or transactions.

73.     In the alternative, in the event that no valid Loan Agreement existed, the $2,000,000 Transfer was made to or for the benefit of Hackl (an insider), or incurred to or for the benefit of Hackl, under an employment contract and not in the ordinary course of business.

74.     RGL did not receive reasonably equivalent value or fair consideration for the Loan Agreement or the the $2,000,000 Transfer, which purportedly constituted a loan from RGL to Clarnet.  Clarnet never made a single interest or principal payment on this loan and, upon information and belief, Clarnet never intended for the loan to be repaid.

75.     Both the Loan Agreement evidencing the $2,000,000 Transfer and the $2,000,000 Transfer made pursuant thereto are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

DC1:#8139906

76.     Clarnet was the initial transferee of the $2,000,000 Transfer. Alternatively, Clarnet acted as a mere conduit for the fraudulent transfer of the funds to Hackl as the initial transferee.

77.     Because the Loan Agreement and the $2,000,000 Transfer are avoidable under the Bankruptcy Code, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the $2,000,000 Transfer from Clarnet.

**COUNT II**
**Recovery from Hackl for December 20, 2004 Fraudulent Transfer**
**(11 U.S.C. §§ 544(b), 548(a)(1)(B), 550(a)(1), 550(a)(2); NY DCL §§ 270 et seq.)**

78.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

79.     Each of the Loan Agreement and the $2,000,000 Transfer constituted a transfer of an interest in property of RGL. At the time these transfers were made, RGL had at least one creditor with an unsecured claim for liabilities.

80.     The Loan Agreement and the $2,000,000 Transfer, which were made within one year of the Petition Date, were made at a time when RGL (a) was insolvent and/or became insolvent as a result of the transfer or (b) was left with unreasonably small capital in relation to its businesses or transactions.

81.     In the alternative, in the event that no valid Loan Agreement existed, the $2,000,000 Transfer was made to or for the benefit of Hackl (an insider), or incurred to or for the benefit of Hackl, under an employment contract and not in the ordinary course of business.

82.     RGL did not receive reasonably equivalent value or fair consideration for the Loan Agreement or the $2,000,000 Transfer, which purportedly constituted a loan from RGL

to Clarnet.  Clarnet, under Hackl's control, never made a single interest or principal payment on this loan and, upon information and belief, neither Clarnet nor Hackl ever intended for this loan to be repaid.

83.     Both the Loan Agreement evidencing the $2,000,000 Transfer and the $2,000,000 Transfer made pursuant thereto are avoidable as fraudulent transfers under section 548(a)(1)(B) of the Bankruptcy Code.

84.     Upon information and belief, the $2,000,000 Transfer was made to Clarnet for Hackl's benefit, or in the alternative, Clarnet acted as a conduit for the fraudulent transfer of the funds to Hackl as the initial transferee.

85.     Because the Loan Agreement and the $2,000,000 Transfer are avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the $2,000,000 Transfer from Hackl.

86.     In the alternative, upon information and belief, Hackl was an immediate or mediate transferee of the $2,000,000 Transfer and did not take the $2,000,000 Transfer for value, in good faith, and without knowledge of the voidability of the transfer.

87.     Thus, in the alternative, because the $2,000,000 Transfer is avoidable under the Bankruptcy Code, pursuant to Bankruptcy Code section 550(a)(2), Plaintiff may recover from Hackl as the immediate or mediate transferee of the $2,000,000 Transfer.

## COUNT III
### Recovery from Clarnet for December 20, 2004 Fraudulent Transfer
### (11 U.S.C. §§ 548(a)(1)(A), 550(a)(1))

88.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

DC1:#8139906

89.     The Loan Agreement and the $2,000,000 Transfer constituted a transfer of an interest in property of RGL.  At the time these transfers were made, RGL had at least one creditor with an unsecured claim for liabilities.

90.     The Loan Agreement and the $2,000,000 Transfer were made within one year of the filing of the Petition Date.

91.     While Hackl helped Bennett and the other Co-Conspirators carry out the fraudulent Round-Trip Loan scheme, Bennett with the assistance of other Co-Conspirators caused RGL to make the Loan Agreement and the $2,000,000 Transfer to Clarnet, an entity wholly owned by Hackl, with the actual intent to hinder, delay, or defraud the creditors of RGL. The $2,000,000 Transfer was disguised as a loan but in reality served no purpose other than to personally benefit Hackl at the expense of RGL's creditors.

92.     When Clarnet entered into the Loan Agreement and took the $2,000,000 Transfer, Clarnet (via Hackl's 100% ownership of Clarnet) was fully aware of the fraudulent Round-Trip Loans and Hackl's participation therein.

93.     Both the Loan Agreement and the $2,000,000 Transfer are avoidable as fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code.

94.     Significantly, Bennett with the assistance of other Co-Conspirators caused RGL to enter into the Loan Agreement with the actual intent to hinder, delay, or defraud RGL's then existing and future creditors.

95.     Moreover, Bennett with the assistance of other Co-Conspirators caused RGL to make the $2,000,000 Transfer with the actual intent to hinder, delay, or defraud RGL's then existing and future creditors.

DC1:#8139906

96.     Clarnet was the initial transferee of the $2,000,000 Transfer. Alternatively, Clarnet acted as a mere conduit for the fraudulent transfer of the funds to Hackl as the initial transferee.

97.     Because the Loan Agreement and the $2,000,000 Transfer are avoidable under the Bankruptcy Code, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the $2,000,000 received by Clarnet.

**COUNT IV**
**Recovery from Hackl for December 20, 2004 Fraudulent Transfer**
**(11 U.S.C.  §§ 548(a)(1)(A), 550(a)(1), 550(a)(2))**

98.     Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

99.     The Loan Agreement and the $2,000,000 Transfer constituted a transfer of an interest in property of RGL.  At the time the transfers were made, RGL had at least one creditor with an unsecured claim for liabilities.

100.    The Loan Agreement and the $2,000,000 Transfer was made within one year of the filing of the Petition Date.

101.    While Hackl helped Bennett and the other Co-Conspirators carry out the fraudulent Round-Trip Loan scheme, Bennett with the assistance of other Co-Conspirators caused RGL to enter into the Loan Agreement and make the $2,000,000 Transfer to Clarnet, an entity wholly owned by Hackl, with the actual intent to hinder, delay, or defraud the creditors of RGL.  The $2,000,000 Transfer was disguised as a loan but in reality served no purpose other than to personally benefit Hackl at the expense of RGL's creditors.

DC1:#8139906

102.    When Clarnet entered into the Loan Agreement and took the $2,000,000 Transfer, Clarnet was fully aware (via Hackl's 100% ownership of Clarnet) of the fraudulent Round-Trip Loans and Hackl's participation therein.

103.    Both the Loan Agreement and the $2,000,000 Transfer are avoidable as fraudulent transfers under section 548(a)(1)(A) of the Bankruptcy Code.

104.    Significantly, Bennett with the assistance of other Co-Conspirators caused Refco to enter into the Loan Agreement with the actual intent to hinder, delay, or defraud RGL's then existing and future creditors.

105.    Moreover, Bennett with the assistance of other Co-Conspirators caused RGL to make the $2,000,000 Transfer with the actual intent to hinder, delay, or defraud RGL's then existing and future creditors.

106.    Upon information and belief, the $2,000,000 Transfer was made for Hackl's benefit, or in the alternative, Clarnet acted as a conduit for the fraudulent transfer of the funds to Hackle as the initial transferee.

107.    Because the Loan Agreement and the $2,000,000 Transfer are avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the $2,000,000 received by Clarnet for Hackl's benefit from Hackl.

108.    In the alternative, upon information and belief, Hackl was an immediate or mediate transferee of the $2,000,000 Transfer and did not take the $2,000,000 Transfer for value, in good faith, and without knowledge of the voidability of the transfer.

109.    Thus, in the alternative, because the $2,000,000 Transfer is avoidable under the Bankruptcy Code, pursuant to Bankruptcy Code section 550(a)(2) Plaintiff may

DC1:#8139906

recover from Hackl as the immediate or mediate transferee of any portion of the $2,000,000

Transfer received by him.

**COUNT V**
**Recovery from Clarnet for September 28, 2004 Fraudulent Transfer**
**(11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 270 et seq.)**

110.    Plaintiff repeats, realleges and incorporates by reference the allegations

contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of

action.

111.    The $3,000,000 Clarnet Transfer made on September 28, 2004 (the

"$3,000,000 Transfer") constituted a transfer of an interest in property of RCC and/or RGL.  At

the time this transfer was made, RCC and/or RGL had at least one creditor with an unsecured

claim for liabilities.

112.    The $3,000,000 Transfer (i) was made at a time when RCC and/or RGL

(a) were insolvent and/or became insolvent as a result of the transfer or (b) were left with

unreasonably small capital in relation to their businesses or transactions; or (ii) was made to or

for the benefit of Hackl (an insider), or incurred to or for the benefit of Hackl, under an

employment contract and not in the ordinary course of business.

113.    RCC and/or RGL did not receive fair consideration for the $3,000,000

Transfer, which, upon information and belief, constituted "consulting fees" that RCC and/or

RGL purportedly owed to Clarnet.  On information and belief, Clarnet did not perform any

consulting or other services for RCC and/or RGL or otherwise gave RCC and/or RGL anything

of value in exchange for the $3,000,000 Transfer.

114.    The $3,000,000 Transfer is avoidable as a fraudulent transfer under

section 544(b) of the Bankruptcy Code, incorporating NY DCL section 270 et seq.

- 23 -

115.    Clarnet was the initial transferee of the $3,000,000 Transfer. Alternatively, Clarnet acted as a mere conduit for the fraudulent transfer of the funds to Hackl as the initial transferee.

116.    Because the $3,000,000 Transfer is avoidable under the Bankruptcy Code, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the $3,000,000 received by Clarnet.

## COUNT VI
### Recovery from Hackl for September 28, 2004 Fraudulent Transfer
### (11 U.S.C. §§ 544(b), 550(a)(1), 550(a)(2); NY DCL §§ 270 et seq.)

117.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

118.    The $3,000,000 Transfer constituted a transfer of an interest in property of RCC and/or RGL.  At the time this transfer was made, RCC and/or RGL had at least one creditor with an unsecured claim for liabilities.

119.    The $3,000,000 Transfer (i) was made at a time when RCC and/or RGL (a) were insolvent and/or became insolvent as a result of the transfer or (b) were left with unreasonably small capital in relation to their businesses or transactions; or (ii) was made to or for the benefit of Hackl (an insider), or incurred to or for the benefit of Hackl, under an employment contract and not in the ordinary course of business.

120.    RCC and/or RGL did not receive fair consideration for the $3,000,000 Transfer, which, upon information and belief, constituted "consulting fees" that RCC and/or RGL purportedly owed to Clarnet.  On information and belief, Clarnet did not perform any

consulting or other services for RCC and/or RGL or otherwise gave RCC and/or RGL anything of value in exchange for the $3,000,000 Transfer.

121.    The $3,000,000 Transfer is avoidable as a fraudulent transfer under section 544(b) of the Bankruptcy Code, incorporating NY DCL section 270 et seq.

122.    Upon information and belief, the $3,000,000 transfer was made to Clarnet for Hackl's benefit, or in the alternative, Clarnet acted as a conduit for the fraudulent transfer of the funds to Hackle as the initial transferee.

123.    Because the $3,000,000 Transfer is avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the $3,000,000 received by Clarnet for Hackl's benefit from Hackl.

124.    In the alternative, upon information and belief, Hackl was an immediate or mediate transferee of the $3,000,000 Transfer and did not take the $3,000,000 Transfer for value, in good faith, and without knowledge of the voidability of the transfer.

125.    Thus, in the alternative, because the $3,000,000 Transfer is avoidable under the Bankruptcy Code, pursuant to Bankruptcy Code section 550(a)(2), Plaintiff may recover from Hackl as the immediate or mediate transferee of any portion of the $3,000,000 Transfer received by him.

## COUNT VII
### Recovery from Clarnet for Fraudulent Transfers
### (11 U.S.C. §§ 544(b), 550(a)(1); NY DCL §§ 270 et seq.)

126.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

DC1:#8139906

127.    Pursuant to Bankruptcy Code section 544, Plaintiff has the rights of an existing unsecured creditor of the Debtors.  Section 544 permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

128.    All of the Clarnet Transfers constituted transfers of interests in property of RCC and/or RGL.  RCC and/or RGL had at least one creditor with an unsecured claim for liabilities at the time each of the transfers was made.

129.    While Hackl helped Bennett and the other Co-Conspirators carry out the fraudulent Round-Trip Loan scheme, Bennett, with the assistance of other Co-Conspirators, caused RCC and/or RGL to make the Clarnet Transfers to Clarnet, an entity wholly owned by Hackl, with the actual intent to hinder, delay, or defraud the creditors of RCC and/or RGL.  The Clarnet Transfers served no purpose other than to personally benefit Hackl at the expense of other creditors.

130.    Aside from the $2,000,000 Transfer, Clarnet received the Clarnet Transfers ostensibly as "consulting fees" from 2000 to 2004.  Upon information and belief, Clarnet did not perform any consulting or other services in exchange for these transfers.

131.    When Clarnet took the fraudulent Clarnet Transfers, Clarnet was fully aware (via Hackl's 100% ownership of Clarnet) of the fraudulent Round-Trip Loans and Hackl's participation therein.

132.    The Clarnet Transfers are avoidable as fraudulent transfers pursuant to section 544 of the Bankruptcy Code incorporating NY DCL section 270 et seq.

133.    Significantly, Bennett with the assistance of other Co-Conspirators caused RCC and/or RGL to make the Clarnet Transfers with the actual intent to hinder, delay, or defraud then existing or future creditors of RCC and/or RGL.

- 26 -

134.    Clarnet was the initial transferee of the Clarnet Transfers.  Alternatively, Clarnet acted as a mere conduit for the fraudulent transfer of the funds to Hackl as the initial transferee.

135.    Because the distributions made pursuant to the Clarnet Transfers are avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the distributions received by the Clarnet in connection with the Clarnet Transfers.

**COUNT VIII**
**Recovery from Hackl for Fraudulent Transfers**
**(11 U.S.C. §§ 544(b), 550(a)(1), 550(a)(2); NY DCL §§ 270 et seq.)**

136.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

137.    Pursuant to Bankruptcy Code section 544, Plaintiff has the rights of an existing unsecured creditor of the Debtors.  Section 544 permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

138.    All of the Clarnet Transfers constituted transfers of interests in property of RCC and/or RGL.  RCC and/or RGL had at least one creditor with an unsecured claim for liabilities at the time each of the transfers was made.

139.    While Hackl helped Bennett and the other Co-Conspirators carry out the fraudulent Round-Trip Loan scheme, Bennett with the assistance of other Co-Conspirators caused RCC and/or RGL to make Clarnet Transfers to Clarnet, an entity wholly owned by Hackl, with the actual intent to hinder, delay, or defraud the creditors of RCC and/or RGL.  The Clarnet

Transfers served no purpose other than to personally benefit Hackl at the expense of other creditors.

140.    Aside from the $2,000,000 Transfer, Clarnet received the Clarnet Transfers ostensibly as "consulting fees" from 2000 to 2004.  Upon information and belief, Clarnet did not perform any consulting or other services in exchange for these transfers.

141.    The $2,000,000 Transfer was transferred from RCC and/or RGL to Clarnet as a "loan" in 2004.  Upon information and belief, Clarnet never intended for this loan to be repaid.  Indeed, Clarnet never made a single interest or principal payment on the loan.

142.    When Clarnet took the fraudulent Clarnet Transfers, Clarnet was fully aware (via Hackl's 100% ownership of Clarnet) of the fraudulent Round-Trip Loans and Hackl's participation therein.

143.    The Clarnet Transfers are avoidable as fraudulent conveyances or fraudulent transfers pursuant to section 544 of the Bankruptcy Code incorporating NY DCL section 270 et seq.

144.    Significantly, Bennett with the assistance of other Co-Conspirators caused Refco to make the Clarnet Transfers with the actual intent to hinder, delay, or defraud then existing or future creditors of RCC and/or RGL.

145.    Upon information and belief, the Clarnet Transfers were made for Hackl's benefit, or in the alternative, Clarnet acted as a conduit for the fraudulent transfers of the funds to Hackle as the initial transferee.

146.    Because the Clarnet Transfers are avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(1), Plaintiff may recover the Clarnet Transfers received by Clarnet for Hackl's benefit from Hackl.

147.    In the alternative, upon information and belief, Hackl was an immediate or mediate transferee of the Clarnet Transfers and did not take the Clarnet Transfers for value, in good faith, and without knowledge of the voidability of the transfers.

148.    Thus, in the alternative, because the Clarnet Transfers are avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(2), Plaintiff may recover from Hackl as the immediate or mediate transferee of any portion of the Clarnet Transfers received by him.

## COUNT IX
### Recovery from Acies and WPM for Fraudulent Transfer
### (11 U.S.C. §§ 544(b), 550(a)(1), 550(a)(2); NY DCL §§ 270 et seq.)

149.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

150.    Pursuant to Bankruptcy Code section 544, Plaintiff has the rights of an existing unsecured creditor of the Debtors.  Section 544 permits Plaintiff to assert claims and causes of action that such a creditor could assert under applicable state law.

151.    The Acies Interest Transfer constituted a transfer of interests in property of RCM.  RCM had at least one creditor with an unsecured claim for liabilities at the time the transfer was made.

152.    Upon information and belief, on or about June 30, 2004, Maggio, a fellow participant in the Round-Trip Loan scheme purported to cause RCM to transfer its interest in Acies to RGHI.  RCM received no consideration in return.

153.    Upon information and belief, at all relevant times hereto, Acies was controlled and/or owned in part by Hackl.

154.    Upon information and belief, sometime after RCM transferred its interest in Acies to RGHI, the Acies Merger occurred, whereby AA was merged into Acies and subsequently WPM acquired all the shares of Acies.  In connection with the Acies Merger, RGHI transferred the ownership interest in Acies that it received through the Acies Interest Transfer to Acies, potentially through Hackl, and said interest was subsequently transferred to WPM.

155.    Upon information and belief, the purported Acies Interest Transfer was made so that Hackl could purport to effectuate, with the assistance of RGHI, the sale of 100% of Acies for his own benefit to WPM.  Thus, the Acies Interest Transfer was made in furtherance of the fraudulent schemes being perpetuated by Hackl and the other Co-Conspirators.

156.    RCM, at the direction Maggio, Hackl, and the other Co-Conspirators, made the Acies Interest Transfer with the actual intent to hinder, delay, or defraud RCM's then existing and future creditors.

157.    The Acies Interest Transfer is avoidable as a fraudulent conveyance or transfer pursuant to section 544 of the Bankruptcy Code incorporating NY DCL section 270 et seq.

158.    Hackl, Acies, and/or WPM were the immediate or mediate transferees of the Acies Interest Transfer and did not take the Acies Interest Transfer for value, in good faith, and without knowledge of its voidability.

159.    Because the Acies Interest Transfer is avoidable under the Bankruptcy Code and applicable state law, pursuant to Bankruptcy Code section 550(a)(2), Plaintiff may recover from Hackl, Acies, and/or WPM as the immediate or mediate transferees of the Acies Interest Transfer.

DC1:#8139906

## COUNT X
**Breach of Contract Against Clarnet**

160.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

161.    In 2004, upon information and belief, Refco and Clarnet executed the written Loan Agreement whereby Refco agreed to loan Clarnet $2,000,000 in exchange for Clarnet's promise to repay the $2,000,000 plus interest.

162.    On December 20, 2004, RGL wired $2,000,000 to Clarnet in accordance with its obligation under the Loan Agreement.

163.    Clarnet, however, neither repaid any portion of the $2,000,000 principal nor paid Refco any interest that became due under the Loan Agreement despite, upon information and belief, maturity.

164.    Clarnet's failure to pay any portion of the principal or interest due under the Loan Agreement amounted to a material breach of the Loan Agreement.

165.    As a result of Clarnet's breach, the Debtors have suffered damages of no less than $2,000,000, plus all applicable interest.  Plaintiff may recover these damages.

## COUNT XI
**Breach of Fiduciary Duties**

166.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

167.    As Refco's Executive Vice President and a member of its management committee from 2002 to 2004, Hackl owed Refco fiduciary duties, including duties of care, good

DC1:#8139906

faith and loyalty. Hackl's fiduciary duties required him to inform himself of the details surrounding and the purposes underlying the multi-hundred million dollar Round-Trip Loans that he helped effectuate in February and March of 2003 and 2004. Hackl's fiduciary duties to Refco also required him to refrain from engaging in self-dealing transactions that would benefit himself to the detriment of Refco.

168.    Hackl breached his fiduciary duties to Refco by knowingly and actively participating in the fraudulent Round-Trip Loans in 2003 and 2004 (among others) and by transferring funds to Clarnet, an entity which, upon information and belief, he wholly owned. The Round-Trip Loan scheme hid Refco's true financial condition from the public and enabled Hackl to sustain his employment and to receive millions in fraudulent transfers from Refco.

169.    While Hackl was breaching his fiduciary duties to Refco, he was receiving compensation for his employment.

170.    As a direct and proximate result of Hackl's breach of his fiduciary duties the Debtors have suffered damages. Plaintiff may recover these damages and all compensation paid to Hackl.

## COUNT XII
### Aiding and Abetting Fraud

171.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

172.    From 2000 to 2005, Bennett and other former Refco executives and owners knowingly misrepresented Refco's financial position by orchestrating and perpetuating the fraudulent Round-Trip Loan scheme described above.

DC1:#8139906

173.    Hackl willingly and knowingly provided substantial assistance to the fraudulent Round-Trip Loan scheme by helping BAWAG and Refco effectuate the Round-Trip Loans each February and March from 2000 to 2005.

174.    Moreover, under the direction and control of Hackl, Acies aided and abetted Bennett and other Co-Conspirators in the fraudulent schemes by purporting to transfer RCM's interest in Acies to RGHI and subsequently sell said interest to WPM.

175.    By purporting to make the transfer, Acies, under the direction and control of Hackl, aided and abetted the perpetuation of the fraudulent scheme orchestrated by the Co-Conspirators by stripping assets from RCM and purporting to transfer them to RGHI for no consideration.

176.    Moreover, WPM aided and abetted in the fraud by subsequently acquiring the shares of Acies, that were transferred by RCM to RGHI and subsequently to Hackl and/or Acies in furtherance of the fraudulent scheme.

177.    As a direct and proximate result of Hackl's assistance in the fraudulent Round-Trip Loan scheme and Acies' purported transfer of RCM's interest in Acies to RGHI and subsequently to WPM, the Debtors have suffered damages in an amount to be determined. Plaintiff may recover these damages.

## COUNT XIII
### Civil Conspiracy

178.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

179.    Upon information and belief, Hackl, Bennett, and the other Co-Conspirators knowingly, intentionally, and maliciously agreed to engage in the fraudulent

DC1:#8139906

Round-Trip Loans scheme described above in order to misrepresent Refco's financial position in order to enrich themselves.

180.    Moreover, Acies (through Hackl's control and direction) and WPM were engaged in this conspiracy  by participating in the stripping of assets from RCM to RGHI while the Co-Conspirators were perpetuating this fraudulent scheme.

181.    This agreed-upon scheme constituted a civil conspiracy among Hackl, Bennett, the other Co-Conspirators, Acies, and WPM to commit fraud.  Upon information and belief, the parties to the conspiracy knowingly and intentionally effected the fraudulent Round-Trip Loan transactions described above in furtherance of the conspiracy and Acies (under the control and direction of Hackl) and WPM knowingly and intentionally purported to transfer RCM's interest to RGHI in furtherance of this scheme.

182.    As co-conspirators, Hackl, Acies, and WPM are liable for the foreseeable actions of Bennett and the other Co-Conspirators made in furtherance of the conspiracy and for the consequences of those actions.

183.    The Debtors were damaged by the actions of Bennett and the other Co-Conspirators made in furtherance of the conspiracy.  Hackl, Acies, and WPM are vicariously liable to Debtors for these damages.  Plaintiff may recover these damages.

### COUNT XIV
### Breach of Contract Against Acies

184.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

185.    On August 17, 2000, RCM entered into the Revenue Sharing Agreement with Acies, whereby RCM was to receive 50% of the first SF 5 million of net revenue (SF 2.5 million) and 20% of net revenues thereafter.

186.    As of May 2004 amounts owed to RCM from Acies under the Revenue Sharing Agreement were approximately SF 7.8 million .

187.    Upon information and belief, to date, no amounts under the Revenue Sharing Agreement have been remitted to RCM by Acies pursuant to the Revenue Sharing Agreement.

188.    Acies' failure to pay any portion of the amounts due and owing under the Revenue Sharing Agreement constitutes a material breach of the Revenue Sharing Agreement.

189.    As a result of Acies' breach, the Debtors have suffered damages and Plaintiff may recover from Acies for its breach and/or any amounts due and owing under the Revenue Sharing Agreement.

## COUNT XV
### Unjust Enrichment

190.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

191.    Hackl and Clarnet were enriched upon receipt of the Clarnet Transfers by receiving something of value that belonged to the Debtors.

192.    These enrichments violate equity and good conscience.

193.    These enrichments did not result from a valid and enforceable contract between any of the Debtors and Hackl or Clarnet.

194.    The Debtors have suffered damages as a result of this unjust enrichment in an amount equal to the total value of the Clarnet Transfers, plus interest.  Plaintiff may recover these damages.

## COUNT XVI
### Equitable Subordination

195.    Plaintiff repeats, realleges and incorporates by reference the allegations contained in all preceding paragraphs of this Complaint as though fully set forth in this cause of action.

196.    The Defendants are guilty of inequitable, unconscionable and unfair conduct, including causing Refco to disseminate false and misleading statements.

197.    The inequitable, unconscionable and unfair conduct of the Defendants has resulted in injury to the Debtors and its creditors.

198.    Equitable subordination of the Defendants' claims would be consistent with the provisions of the Bankruptcy Code.

199.    All of the Defendants' claims against the Debtors should be equitably subordinated to the claims of all other creditors.  Moreover, any and all liens, secured claims and set off rights of the Defendants with respect to the Debtors should be avoided and annulled to the extent necessary to satisfy claims of all other creditors.

## VI.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for relief and judgment, as follows:

a.    Declaring that the $2,000,000 Transfer is avoidable pursuant to Bankruptcy Code sections 548 and 550;

b.    Declaring that the $3,000,000 Transfer is avoidable pursuant to Bankruptcy Code sections 544 and 550 and NY DCL sections 270 et seq.;

c.   Declaring that all the Clarnet Transfers are avoidable pursuant to Bankruptcy Code sections 544 and 550 and NY DCL sections 270 et seq.;

d.   Declaring that the Acies Interest Transfer is avoidable pursuant to Bankruptcy Code sections 544 and 550 and NY DCL sections 270 et seq.;

e.   Awarding Plaintiff judgment in an amount equal to the Clarnet Transfers and directing Clarnet and Hackl immediately to pay Plaintiff an amount equal to the Clarnet Transfers pursuant to section 550(a) of the Bankruptcy Code, together with interest on such amount from the date of the transfers;

f.   Awarding Plaintiff judgment in an amount equal to the Acies Interest Transfer and directing Hackl, Acies, and WPM immediately to pay Plaintiff an amount equal to the Acies Interest Transfer pursuant to section 550(a) of the Bankruptcy Code, together with interest on such amount from the date of the transfers;

g.   Awarding Plaintiff damages incurred as a result of Clarnet's breach of the $2 million Loan Agreement;

h.   Awarding Plaintiff damages incurred as a result of Hackl's breaches of his fiduciary duties of care and loyalty to Refco, including, but not limited to, the return of all compensation Hackl received for his employment;

i.   Awarding Plaintiff damages incurred as a result of (i) Hackl's aiding and abetting the fraudulent Round-Trip Loan scheme and conspiring with others to carry out the fraudulent Round-Trip Loan scheme and (ii) Acies

DC1:#8139906

and WPM's aiding and abetting the fraudulent scheme by, and conspiring to bleed the Debtors of their assets;

j.      Awarding Plaintiff damages incurred as a result of Acies' breach of the Revenue Sharing Agreement and damages for any amounts due and owing under the Revenue Sharing Agreement;

k.      Awarding Plaintiff judgment in an amount equal to the amount by which Clarnet and Hackl were unjustly enriched or ordering Clarnet and Hackl to disgorge those amounts to Plaintiff, including, but not limited to, all compensation Hackl received for his employment;

l.      Equitably subordinating the Defendants claims against the Debtors due to their inequitable conduct;

m.      Awarding the Plaintiff punitive damages as a result of the Defendants' fraudulent conduct;

n.      Awarding Plaintiff attorneys' fees, costs and other expenses incurred in this action; and

o.      Granting such other and further relief as the Court considers appropriate.

## VII.    <u>JURY DEMAND</u>

200.    Plaintiff demands a trial by jury on all issues triable by a jury.

Dated: October 15, 2007
       New York, New York

**MILBANK, TWEED, HADLEY & McCLOY LLP**

Scott A. Edelman (SE 5247)
Kylie Davidson (KD 0502)
1 Chase Manhattan Plaza
New York, NY 10005
(212) 530-5000

*Counsel for Plaintiff Marc S. Kirschner,
as Trustee for the Refco Litigation Trust*

Of Counsel:

William E. Wallace, III *(pro hac vice pending)*
Adrian Azer *(pro hac vice pending)*
Milbank Tweed Hadley & McCloy
1850 K Street, NW
Washington, DC 20006
(202) 835-7511

*Counsel for Plaintiff Marc S. Kirschner,
as Trustee for the Refco Litigation Trust*

DC1:#8139906